UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| COLLABORATION TECHNOLOGIES, INC. | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| Vs. | ) | C.A. # 2008- 165ML |
| | ) | **EXPEDITED** |
| CAPEWELL COMPONENTS CO., LLC. | ) | **CONSIDERATION** |
| | ) | **REQUESTED** |
| Defendant | ) | |

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER / PRELIMINARY INJUNCTION[1]

NOW COMES the Plaintiff, Collaboration Technologies, Inc. (hereafter, "CTI"), and, pursuant to Fed. R. Civ. P. 65, hereby moves this Honorable Court for a temporary restraining order and/or preliminary injunction (1) enjoining and restraining Defendant Capewell Components Co., LLC. from interfering with and/or terminating the contractual relations between CTI and the Australian Government Department of Defence ("DOD"), (2) enjoining and restraining said defendant from prematurely terminating the contract between CTI and the defendant, (3) ordering the defendant to perform its obligations under its contract with CTI, and (4) ordering the defendant to (a) withdraw/rescind its recent request to the DOD that the DOD terminate its purchase order for CTI's software and related services and (b) withdraw/rescind its recent withdrawal of its pending invoice

[1] The relief being sought may also be characterized as a mandatory injunction. When a party's interests can be protected in no other way, such relief is entirely proper for a court of equity to award. Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 66 F. Supp. 2d 317, 326 (D.R.I. 1999), *citing* St. Michael's Ukranian Greek Catholic Church of Woonsocket v. Bohachewsky, 48 R.I. 234, 136 A. 878, 880 (1927).

issued to the DOD approximately 2 months ago. In short, CTI is seeking relief from this Court to protect and preserve the critically important contractual relationship between and among the DOD, CTI and the defendant and to restore the status of same as it existed prior to the defendant's recent willful, tortuous and inexcusable actions.

CTI respectfully requests that this Honorable Court give this motion expedited consideration. The recent actions and omissions of the defendant greatly jeopardize the advantageous contractual relations between CTI and the DOD and, in fact, are intended to sever those relations immediately. Thus, the defendant's actions and omissions seriously threaten the pending, partially completed execution of critical technology deliverables to the DOD.

In support hereof, CTI submits the memorandum attached hereto and filed herewith.

COLLABORATION
TECHNOLOGIES, INC.
By its attorneys,

Brockmann & Associates, Ltd.

By: ______________________

Peter J. Brockmann, Esq. #4355
77 Narragansett Avenue
Jamestown, Rhode Island 02835
(401) 423-1969; fax: (401) 633-6143
pjb@brocklaw.net

CERTIFICATE OF SERVICE

The undersigned hereby certifies that true and accurate copies of the within Motion, accompanying Memorandum and Affidavit were served upon Capewell Components Co., LLC. ATTN: Kenneth MacCormac, President, by facsimile #860-610-0120 and by certified mail, return receipt requested to 105 Nutmeg Road South, South Windsor, CT 06074 on this 2nd day of May, 2008.

______________________

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| COLLABORATION TECHNOLOGIES, INC. | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| Vs. | ) | C.A. # 2008-165ML |
| | ) | **EXPEDITED** |
| CAPEWELL COMPONENTS CO., LLC. | ) | **CONSIDERATION** |
| | ) | **REQUESTED** |
| Defendant | ) | |

MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING
ORDER / PRELIMINARY INJUNCTION

NOW COMES the Plaintiff, Collaboration Technologies, Inc. (hereafter, "CTI"), and, in support of its Motion for Temporary Restraining Order / Preliminary Injunction, states as follows.

FACTS

CTI, incorporated in Rhode Island in 2000, was formed - and has existed primarily - to develop technical software used to support war fighters by way of sophisticated collaboration technology. See *Affidavit of Joshua Trainer* ("*Affidavit*") attached hereto, ¶ 2. The principal of CTI, Joshua Trainer ("Trainer"), has been developing the technology over the past few years; about two years ago, CTI's flagship software product (hereafter, "the Software") became ready for marketing and sales. *Affidavit*, ¶ 3. Lacking in-house sales, marketing and international arms trafficking resources, it was readily apparent to CTI that it would need to form an alliance with another entity to cover these areas of expertise. *Affidavit*, ¶ 4. Accordingly, on or about

April 7, 2005, following weeks of discussions and negotiations, CTI and the defendant began collaborating on efforts to bring the Software to the military sales world-wide market. *Affidavit*, ¶ 4.

The alliance between CTI and the defendant was formalized on February 6, 2006, when the two parties executed a "Sales and Marketing Representative Agreement" (hereafter, "the Agreement"), a true and accurate copy of which is attached as Exhibit A to the Verified Complaint and incorporated herein by reference. CTI chose the alliance with the defendant because of its world-wide sales and marketing experience and capabilities as well as its expertise navigating laws and regulations governing the exportation of military wares to foreign entities. *Affidavit*, ¶ 5.

Pursuant to the Agreement,

a) the defendant was appointed as CTI's sales and marketing representative for the Software with exclusive international rights and limited U.S. rights;

b) the initial term is for four (4) years with an option to extend for one year; and

c) either of the Parties can terminate the Agreement for cause with ninety (90) days written notice to the other (with cause being defined as, among other things, the defendant's failure in year 2 (2/6/07-2/6/08) to sell at least 500 Software licenses). *Verified Complaint, Exhibit A.*

Also, pursuant to the Agreement, "[r]esponsibility for compliance with the United States Department of State International Traffic in Arms Regulations (22CFR Parts 120-130) and any other United States export controls shall lie solely with CAPEWELL [the defendant] ... [who] shall be responsible for coordinating and submitting the application

for any necessary licenses for the export of technical data and classified defense articles." *Verified Complaint, Exhibit A.*

In or about May 2006, the Australian Government Department of Defence (hereafter, "A-DOD") representatives expressed to CTI their initial interest in the Software. *Affidavit*, ¶ 6.

Thereafter, pursuant to the Agreement, CTI and the defendant collaborated on efforts to secure a purchase order from A-DOD including when, at the end of October 2007, and with the defendant's full knowledge and consent, CTI conducted on-site testing and evaluation of the Software in Australia for A-DOD. *Affidavit*, ¶ 7. CTI performed these tasks on-site for the Australian defense department in reliance upon the defendant's affirmative representations that all export licenses and applicable laws and regulations were obtained/satisfied by the defendant as called for in the Agreement. *Affidavit*, ¶ 8. However, as CTI was to learn much later (on April 28), the defendant's export license application to the U.S. State Department was voided and returned to the defendant on March 24, 2008. *Affidavit*, ¶ 8.[1]

On or about December 7, 2007, in response to A-DOD's Request for Quote, the defendant issued a Quotation for 30 Software licenses for a total sum of $390,800.00. *Affidavit*, ¶ 9. The Software licenses required by A-DOD are not simply pre-packaged CD's or DVD's; many months of technical development as well as other third-party software are necessary to fulfill the requirements of A-DOD. *Affidavit*, ¶ 9.

Finally, after years of research, development and marketing efforts, CTI's first major break came when A-DOD issued a purchase order dated December 19, 2007

(hereafter, "the A-DOD P.O.") for 30 Software licenses for the sum of $390,800.00. *Affidavit*, ¶ 10. *Verified Complaint, Exhibit D.* In short, A-DOD became the critically important "launch customer" for CTI; the A-DOD P.O. also has great significance for the potential sale by CTI of hundreds of additional Software licenses to A-DOD and, potentially, thousands of additional licenses worldwide. *Affidavit*, ¶ 10.

The defendant promptly advised CTI that A-DOD sent through "the contract" as negotiated and the defendant would be signing it that day. *Affidavit*, ¶ 11. The defendant exclaimed to CTI: we "are off and running on our first real adventure." *Affidavit*, ¶ 11.

On December 20, 2007, the defendant signed an Acknowledgement and Acceptance of receipt of the A-DOD P.O. *Verified Complaint, Exhibit D.*

Thereafter, CTI stepped up its efforts and resources so as timely to execute upon the A-DOD P.O. and develop the Software ordered by A-DOD. *Affidavit*, ¶ 12.

With a signed, accepted and acknowledged purchase order in hand from the Australians, the defendant in turn issued upon CTI a purchase order (#330803) for the 30 Software licenses (hereafter, as revised, "the CTI P.O."). *Affidavit*, ¶ 13. The CTI P.O. essentially mirrors the deliverables called for in the Australian purchase order. *Affidavit*, ¶ 13.

On or about February 20, 2008, the defendant issued an invoice to A-DOD for the first progress payment due under the purchase order. *Verified Complaint, Exhibit I.*

Under the CTI P.O., the defendant is required to pay CTI the sum of $245,800; the difference between the amounts of the A-DOD P.O. and the CTI P.O. represents compensation to the defendant pursuant to the Agreement for its efforts and participation

[1] Furthermore, apparently the defendant had not obtained the necessary State Department approvals and license(s) when CTI issued the first of the deliverables due to A-DOD under the purchase orders. *Affidavit*,

in securing the A-DOD P.O. and, thereafter, executing upon said purchase order. *Affidavit*, ¶ 14.

In response to CTI's stated concerns that the CTI P.O. did not reflect the requirements in the original CTI quote and CTI's RFQ response document, the defendant issued to CTI a revised purchase order. *Affidavit*, ¶ 15; *Verified Complaint, Exhibit E.*

CTI then promptly acknowledged and accepted (in writing) the CTI P.O. and, on or about the same date, issued an invoice (#2008247) to the defendant in the amount of $110,000.00 representing the initial progress payment due thereunder. *Affidavit*, ¶ 15; *Verified Complaint, Exhibit F.*

Therefore, to sum up the contractual relationships, the Australians (A-DOD) had a binding purchase order with the defendant for, basically, 30 Software licenses; the defendant in turn had a binding purchase order with CTI for those same deliverables. *Affidavit*, ¶ 16. Essentially, CTI was providing the software deliverables to A-DOD by, through and with the assistance of the defendant who, for its efforts and resources, received a "mark-up" (the difference between what (a) CTI is scheduled to receive from the defendant and (b) A-DOD is scheduled to pay the defendant). *Affidavit*, ¶ 16.

On March 8, 2008, in accordance with the purchase order, CTI transmitted to the defendant the first of the deliverables. *Affidavit*, ¶ 17. The defendant promptly acknowledged the transmission and requested CTI's invoice "asap". *Affidavit*, ¶ 17.

To date, the defendant has failed and refused to pay to CTI the sum due and owing pursuant to CTI's invoice dated March 7, 2008, in the amount of $110,000.00 for deliverables and third-party software called for by the CTI P.O. *Affidavit*, ¶ 18. At

---

¶ 8.

present, it is unclear as to whether A-DOD has paid the defendant for the first progress payment as invoiced by the defendant on February 20. *Affidavit*, ¶ 18.

Recently, and quite unexpectedly, the defendant advised CTI that it was terminating the Agreement effective immediately (April 14, 2008) and that it expected to terminate both the A-DOD P.O. and the CTI P.O. *Affidavit*, ¶ 19; *Verified Complaint, Exhibit G.*

In response, CTI reminded the defendant of the Agreement's ninety (90) day termination notice requirement and offered to treat the April 14 letter as such notice, meaning that the Agreement would not terminate until July 14, 2008. *Verified Complaint, Exhibit H.* CTI also asked the defendant not to speak to A-DOD about the defendant's termination of the Agreement until such time as CTI and the defendant had a meeting to discuss the matter. *Verified Complaint, Exhibit H.* CTI repeatedly emphasized the importance of preserving the purchase orders for the Software sales to A-DOD and not jeopardizing the critical relationship with A-DOD; CTI requested an immediate meeting with the defendant. *Verified Complaint, Exhibit H.*

In correspondence dated April 21, the defendant agreed that its termination of the Agreement would not become effective for 90 days (July 14, 2008). However, since then, the defendant has failed to communicate or cooperate with CTI despite repeated requests prompted by a pending milestone of deliverables for A-DOD. *Affidavit*, ¶ 20.

CTI once again requested that the defendant participate in the communications with A-DOD and cooperate with CTI in its continuing efforts timely to execute the deliverables under the CTI P.O. *Affidavit*, ¶ 21. The defendant has failed and refused to cooperate with CTI in its efforts in this regard. *Affidavit*, ¶ 21.

Because of the actions and/or omissions of the defendant, CTI cancelled an April 23 teleconference with A-DOD that had been scheduled to discuss the status of its purchase order and, particularly, the next major milestone of deliverables (Alpha demonstration) due to A-DOD. *Affidavit*, ¶ 22. Typically the defendant and CTI would collaborate on these efforts and be jointly involved in the presentation to A-DOD. *Affidavit*, ¶ 22.

CTI's worst fears were realized when, in correspondence dated April 24, the defendant advised the Australian Ministry of Defence (A-DOD) that it (the defendant) "will not be able to deliver the goods and services ordered" in the A-DOD P.O. "due to a recent company decision to no longer support this product line." *Affidavit*, ¶ 23; *Verified Complaint, Exhibit I.*[2] The defendant asked A-DOD to cancel its purchase order and notified A-DOD that it was canceling its invoice ($130,440.00) issued by the defendant on February 20, 2008. *Verified Complaint, Exhibit I.*

On March 24, 2008, the U.S. State Department notified the defendant that its export license application was voided and was being returned without action. *Affidavit*, ¶ 24. The defendant failed to apprise CTI of this important fact until April 28; meanwhile, CTI was preparing for a Software demonstration to A-DOD scheduled for April 30 as called for in the CTI P.O. *Affidavit*, ¶ 24.

Not only has the defendant breached its obligations and responsibilities to CTI pursuant to the Agreement, it is asking A-DOD to cancel its contract for the Software. *Affidavit*, ¶ 25; *Verified Complaint, Exhibit I.* Should A-DOD accede to the defendant's

---

[2] On April 29, the defendant finally disclosed to CTI that the notice to A-DOD had been sent. *Affidavit*, ¶ 23.

request, that will effectively negate the purchase order between CTI and the defendant. *Affidavit*, ¶ 25.[3]

At all times relevant hereto, CTI has been ready, willing and able to perform its obligations under the CTI P.O. and continues to develop the deliverables called for in said purchase order. *Affidavit*, ¶ 26.

LEGAL ANALYSIS

*The Well-Established Standards for Injunctive Relief*

When considering a request for a temporary restraining order or preliminary injunction, the Court must consider the following four factors: (1) the likelihood that the moving party will succeed on the merits, (2) the potential for irreparable harm if the injunctive relief is denied, (3) the balance of relevant impositions (i.e., the hardship to the nonmovant if the injunction is granted as contrasted with the hardship to the movant if no injunction issues), and (4) the effect (if any) of the court's ruling on the public interest. See Weaver v. Henderson, 984 F.2d 11, 12 & n.3 (1st Cir. 1993); Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir. 1991). For the reasons set forth below, CTI has satisfied the foregoing factors.

**CTI Will Suffer Immediate and Substantial Irreparable Harm If Injunctive Relief is Not Granted.**

Quite simply, unless injunctive relief is not granted in favor of CTI, its ability to continue as a going concern will be severely jeopardized, its relationship with the

[3] There is a possibility that A-DOD will re-issue a purchase order directly to CTI; however, there are obvious risks associated with simply hoping and expecting that will occur. *Affidavit*, ¶ 25. If CTI did not require the services and expertise of the defendant, it would have dealt directly with A-DOD in the first place; furthermore, there is no guaranty that A-DOD even has the authority to deal directly with CTI. *Affidavit*, ¶ 25. Clearly, there are potentially many, difficult hurdles for CTI to overcome should the defendant continue to fail and refuse to perform under the Agreement and the other existing contracts (purchase orders). *Affidavit*, ¶ 25. Even assuming success clearing those hurdles, there will very likely be

Australian defense department (A-DOD) will be seriously undermined - if not entirely destroyed, and its reputation within the military arms procurement industry will be irreparably harmed. The resulting damage would be difficult to measure. Without the purchase order from A-DOD, the purchase order between CTI and the defendant is rendered useless and void. Not only would CTI lose this critically important "launch customer", it would likely also lose any further opportunities to do business with A-DOD and, perhaps, beyond A-DOD to other foreign and/or domestic arms procurement entities. The importance to CTI of the pending purchase orders for sales of the Software to A-DOD cannot be emphasized enough. It has taken years of development and marketing to get CTI to this critical juncture. Now, all of that is being threatened by the recent actions of the defendant and the potential repercussions of those actions.

Such harm certainly satisfies the irreparable harm requirement. Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12 (1st Cir. 1996) (affirmance of preliminary injunction against termination of a product line even though it accounted for less than 1% of the movant's annual sales). Indeed, to establish irreparable harm the movant need not show that denial of the injunctive relief will be fatal to its business (which CTI can show in this instance); it need simply to show that its legal remedies are inadequate. Further, even a showing of a possible loss of good will may constitute irreparable harm. Leone v. Town of New Shoreham, 534 A.2d 871, 874 (R.I. 1987). In fact, "an injunction is often a particularly appropriate remedy where the injury suffered by the plaintiff is to its reputation or goodwill." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 66 F.Supp. 317, 326 (D.R.I. 1999). Injury to reputation or goodwill "are irreparable in the sense that

---

further delay to CTI simply realizing the initial progress payment due for the deliverables (now past due), let alone the additional progress payments that will be coming due under the contracts. *Affidavit*, ¶ 25.

measuring their value in terms of dollars and cents is nearly an impossible task. An injunction may also be an appropriate remedy where the damage suffered by a plaintiff is too speculative, yet very real nonetheless, for a monetary award." Id. at 327.

**The Balance of Hardships Tips Decisively in the Movant's Favor**

Certainly, any hardship to the defendant should injunctive relief issue is extremely minor compared to the hardship that will undoubtedly befall CTI should the relief not issue. In order to restore the status quo and mandate that the defendant perform its obligations under the relevant contracts, the defendant must merely take a few simple – but critical – steps: first, it must immediately advise A-DOD that it is withdrawing its request that A-DOD terminated its purchase order; second, it must immediately advise A-DOD that it no longer seeks to withdraw its invoice issued back in February; and third, it must simply perform its obligations under the Agreement until its termination on or about July 14, 2008. None of these actions will require any significant devotion of time or other resources by the defendant.

On the other hand, should injunctive relief not immediately issue, it is entirely possible – if not likely – that A-DOD will accede to the defendant's request to terminate the purchase order. At that point, A-DOD will either re-issue a purchase order directly to CTI (though that process could take weeks if not months) or it will refuse to re-issue a purchase order to CTI. Furthermore, even if A-DOD were promptly to re-issue a purchase order to CTI along the same or substantially similar terms, unless CTI performs its continuing obligations under the Agreement, CTI will be faced with the urgent need to ensure that its dealings with the Australian defense department are approved by the State

Department and satisfy all applicable laws and regulations regarding arms exports. This requires highly specialized expertise and may entail costly delays.

In short, issuance of injunctive relief in this case will impose relatively minor obligations on the part of the defendant while, denial of injunctive relief in this situation could be a deathblow to CTI.

**The Movant is Likely to Succeed on the Merits.**

The movant (CTI) has asserted claims against the defendant for (1) breaches of contract (both the Agreement and the purchase orders), (2) intentional interference with contractual relations between CTI and A-DOD and (3) breach of the implied covenant of good faith and fair dealing.

With respect to the breaches of contract, the movant's case could not be more clear and straightforward. The defendant seeks (in writing) to terminate the purchase order with A-DOD. Certainly, CTI is a direct and intended beneficiary of that contract. Logically, without the A-DOD P.O., the purchase order between CTI and the defendant becomes moot and unnecessary. Despite CTI's significant investment of resources over the past several months up to the present in securing the purchase orders for the A-DOD deliverables and then in executing upon those orders, the defendant now seeks at a whim to terminate the purchase orders. The defendant's reason for doing so is, astoundingly, that it has apparently just decided that it no longer wants to support the Software sales to A-DOD. Despite binding contractual commitments to the Australian defense department and CTI, the defendant seeks unilaterally to remove itself from the commitments.[4] The

[4] The defendant tells CTI that it will encourage A-DOD to re-issue a purchase order directly to CTI. However, there is absolutely no guaranty that A-DOD will in fact do so – it is perhaps just as likely that A-DOD will refuse to issue a purchase order to CTI. Furthermore, again, the defendant pays lip service to CTI, assuring CTI that the defendant will assist during the transition and not interfere with CTI's

defendant has, in short, no legal defenses to its breach of the Agreement or its breaches of the binding purchase orders.

The defendant's actions and/or omissions with respect to the Agreement and the purchase orders clearly breach the implied covenant of good faith and fair dealing. Under Rhode Island law, every commercial contract contains an implied covenant of good faith and fair dealing. Lajayi v. Fafiyebi, 860 A.2d 680, 687 (R.I. 2004). The covenant exists "so that contractual objectives may be achieved." Ross-Simons of Warwick, Inc., 66 F. Supp.2d at 329, *quoting* Fleet Nat'l. Bank v. Liuzzo, 766 F. Supp. 61, 67 (D.R.I. 1991). "The applicable standard ... is whether or not the actions in question are free from arbitrary or unreasonable conduct." 66 F. Supp. at 329 (citations omitted). The defendant's actions and/or omissions are arbitrary and unreasonable and are intended to terminate the contractual objectives of both CTI and A-DOD.

**The Public Interest Will Be Served by Issuance of The Injunctive Relief.**

If injunctive relief is granted, the public interest will be served. For example, jobs will not be lost and investments in CTI will not be destroyed. Moreover, the Australian ministry of defense will receive the important mission planning software that they ordered from CTI through the defendant thereby better equipping their military safely to perform and carry out their critical missions.

---

relationship with CTI. However, the defendant's actions are speaking much louder than its simple words: in the past several days, the defendant has failed and refused to cooperate with CTI in its efforts to continue to execute the deliverables due to A-DOD. The defendant's statement to A-DOD that it is basically getting out of the business of supporting the Software could not interfere more with CTI's important contractual relations with A-DOD.

## CONCLUSION

For the foregoing reasons, CTI respectfully requests that this Honorable Court grant its motion for injunctive relief.

COLLABORATION
TECHNOLOGIES, INC.
By its attorneys,

Brockmann & Associates, Ltd.

By: ________________________
Peter J. Brockmann, Esq. #4355
77 Narragansett Avenue
Jamestown, Rhode Island 02835
(401) 423-1969; fax: (401) 633-6143
pjb@brocklaw.net