UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| COLLABORATION TECHNOLOGIES, INC.<br><br>Plaintiff<br><br>Vs.<br><br>CAPEWELL COMPONENTS CO., LLC.<br><br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. # 2008- 165ML<br>**EXPEDITED CONSIDERATION REQUESTED** |

## AFFIDAVIT IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER / PRELIMINARY INJUNCTION

NOW COMES Joshua Trainer, upon oath and under the pains and penalties of perjury, and states as follows:

1) I am the founder, President, director and majority shareholder of the Plaintiff herein, Collaboration Technologies, Inc. ("CTI").

2) CTI was incorporated in Rhode Island in 2000, and was formed - and has existed - primarily to develop technical software used to support war fighters by way of sophisticated collaboration technology.

3) I have been developing the technology over the past few years; about two years ago, CTI's flagship software product ("the Software") became ready for marketing and sales.

4) Lacking in-house sales, marketing and international arms trafficking resources, it was readily apparent that CTI would need to form an alliance with another entity to cover these areas of expertise. Accordingly, on or about April 7, 2005,

following weeks of discussions and negotiations, CTI and the defendant began collaborating on efforts to bring the Software to the military sales world-wide market.

5) CTI chose the alliance with the defendant because of its world-wide sales and marketing experience and capabilities as well as its expertise navigating laws and regulations governing the exportation of military wares to foreign entities.

6) In or about May 2006, the Australian Government Department of Defence (hereafter, "A-DOD") representatives expressed to CTI their initial interest in the Software.

7) Thereafter, pursuant to the Agreement, CTI and the defendant collaborated on efforts to secure a purchase order from A-DOD including when, at the end of October 2007, and with the defendant's full knowledge and consent, I (CTI) conducted on-site testing and evaluation of the Software in Australia for A-DOD.

8) CTI performed these tasks on-site for the Australian defense department in reliance upon the defendant's affirmative representations that all export licenses and applicable laws and regulations were obtained/satisfied by the defendant as called for in the Agreement. However, as CTI was to learn much later (April 28), the defendant's export license application to the U.S. State Department was voided and returned to the defendant on March 24, 2008.[1]

9) On or about December 7, 2007, in response to A-DOD's Request for Quote, the defendant issued a Quotation for 30 Software licenses for a total sum of $390,800.00. The Software licenses required by A-DOD are not simply pre-packaged

[1] Furthermore, apparently the defendant had not obtained the necessary State Department approvals and license(s) when CTI issued the first of the deliverables due to A-DOD under the purchase orders.

CD's or DVD's; many months of technical development as well as other third-party software are necessary to fulfill the requirements of A-DOD.

10) Finally, after years of research, development and marketing efforts, CTI's first major break came when A-DOD issued a purchase order dated December 19, 2007 (hereafter, "the A-DOD P.O.") for 30 Software licenses for the sum of $390,800.00. In short, A-DOD became the critically important "launch customer" for CTI; the A-DOD P.O. also has great significance for the potential sale by CTI of hundreds of additional Software licenses to A-DOD and, potentially, thousands of additional licenses worldwide.

11) The defendant promptly advised CTI that A-DOD sent through "the contract" as negotiated and the defendant would be signing it that day; the defendant exclaimed to CTI: we "are off and running on our first real adventure."

12) Thereafter, CTI stepped up its efforts and resources so as timely to execute upon the A-DOD P.O. and develop the Software ordered by A-DOD. .

13) With a signed, accepted and acknowledged purchase order in hand from the Australians, the defendant in turn issued upon CTI a purchase order for the 30 Software licenses (hereafter, as revised, "the CTI P.O."). The CTI P.O. essentially mirrors the deliverables called for in the Australian purchase order.

14) Under the CTI P.O., the defendant is required to pay CTI the sum of $245,800; the difference between the amounts of the A-DOD P.O. and the CTI P.O. represents compensation to the defendant pursuant to the Agreement for its efforts and participation in securing the A-DOD P.O. and, thereafter, executing upon said purchase order.

15) In response to CTI's stated concerns that the CTI P.O. did not reflect the requirements in the original CTI quote and CTI's RFQ response document, the defendant issued to CTI a revised purchase order. CTI then promptly acknowledged and accepted (in writing) the CTI P.O. and, on or about the same date, issued an invoice (#2008247) to the defendant in the amount of $110,000.00 representing the initial progress payment due thereunder.

16) Therefore, to sum up the contractual relationships, the Australians (A-DOD) had a binding purchase order with the defendant for, basically, 30 Software licenses; the defendant in turn had a binding purchase order with CTI for those same deliverables. Essentially, CTI was providing the software deliverables to A-DOD by, through and with the assistance of the defendant who, for its efforts and resources, received a "mark-up" (the difference between what (a) CTI is scheduled to receive from the defendant and (b) A-DOD is scheduled to pay the defendant).

17) On March 8, 2008, in accordance with the purchase order, CTI transmitted to the defendant the first of the deliverables. The defendant promptly acknowledged the transmission and requested CTI's invoice "asap".

18) To date, the defendant has failed and refused to pay to CTI the sum due and owing pursuant to CTI's invoice dated March 7, 2008, in the sum of $110,000.00 for deliverables and third-party software called for by the CTI P.O. At present, it is unclear as to whether A-DOD has paid the defendant for the first progress payment as invoiced by the defendant on February 20.

19) Recently, and quite unexpectedly, the defendant advised CTI that it was terminating the Agreement effective immediately (April 14, 2008) and that it expected to terminate both the A-DOD P.O. and the CTI P.O.

20) Despite its assurance that it would respect the 90-day termination clause in the Agreement, the defendant has failed to communicate or cooperate with CTI despite repeated requests prompted by a pending milestone of deliverables for A-DOD.

21) CTI again requested that the defendant participate in the communications with A-DOD and cooperate with CTI in its continuing efforts timely to execute the deliverables under the CTI P.O. However, the defendant has failed and refused to cooperate with CTI in its efforts in this regard.

22) Because of the actions and/or omissions of the defendant, CTI cancelled an April 23 teleconference with A-DOD that had been scheduled to discuss the status of its purchase order and, particularly, the next major milestone of deliverables (Alpha demonstration) due to A-DOD. Typically the defendant and CTI would collaborate on these efforts and be jointly involved in the presentation to A-DOD.

23) CTI's worst fears were realized when, in correspondence dated April 24, the defendant advised the Australian Ministry of Defence (A-DOD) that it (the defendant) "will not be able to deliver the goods and services ordered" in the A-DOD P.O. "due to a recent company decision to no longer support this product line."[2]

24) On March 24, 2008, the U.S. State Department notified the defendant that its export license application was voided and was being returned without action. The defendant failed to apprise CTI of this important fact until April 28, 2008. Meanwhile

CTI was preparing for a Software demonstration to A-DOD scheduled for April 30 as called for in the CTI P.O.

25) Not only has the defendant breached its obligations and responsibilities to CTI pursuant to the Agreement, it is asking A-DOD to cancel its contract for the Software. Should A-DOD accede to the defendant's request, that will effectively negate the purchase order between CTI and the defendant.[3]

26) At all times relevant hereto, CTI has been ready, willing and able to perform its obligations under the CTI P.O. and continues to develop the deliverables called for in said purchase order.

27) The within Affidavit is being provided in support of CTI's request for injunctive relief; CTI fears that, unless the injunctive relief is granted, its relationship with A-DOD will be irreparably injured and harmed and its standing and reputation within the military arms sales community at large will likewise be irreparably harmed and injured and CTI's ongoing viability will be severely jeopardized.

Joshua Trainer

[2] On April 29, the defendant finally disclosed to CTI that the notice to A-DOD had been sent.
[3] There is a possibility that A-DOD will re-issue a purchase order directly to CTI; however, there are obvious risks associated with simply hoping and expecting that will occur. If CTI did not require the services and expertise of the defendant, it would have dealt directly with A-DOD in the first place; furthermore, there is no guaranty that A-DOD even has the authority to deal directly with CTI. Clearly, there are potentially many, difficult hurdles for CTI to overcome should the defendant continue to fail and refuse to perform under the Agreement and the other existing contracts (purchase orders). Even assuming success clearing those hurdles, there will very likely be further delay to CTI simply realizing the initial progress payment due for the deliverables (now past due), let alone the additional progress payments that will be coming due under the contracts.

State of Rhode Island
County of Newport

Then personally appeared before me the above-named Joshua Trainer and acknowledged the foregoing instrument to be his free act and deed on this 1st day of May, 2008.

Notary Public
Printed name: Peter J. Brockmann
My commission expires: 5/2010