UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| COLLABORATION TECHNOLOGIES, INC., Plaintiff | ) | C.A. No. 08-165 |
| vs. | ) | |
| CAPEWELL COMPONENTS CO., LLC, Defendant | ) | |

**DEFENDANT'S COMBINED MOTION TO COMPEL ARBITRATION AND STAY LITIGATION**

Pursuant to Sections 3 and 4 of the Federal Arbitration Act, 9 U.S.C. §§ 3, 4, defendant Capewell Components Co., LLC ("Capewell") hereby respectfully moves the Court to issue an order compelling the plaintiff, Collaboration Technologies, Inc. ("CTI"), to arbitrate its claims against Capewell and, concurrently, to stay litigation of CTI's claims against Capewell in this action until such arbitration proceeding is concluded. As discussed more fully in the accompanying memorandum of law, the Federal Arbitration Act requires the parties to arbitrate such claims as provided in their February 6, 2006 Sales and Marketing Representative Agreement.

**REQUEST FOR ORAL ARGUMENT**

In accordance with Rule 7(e) of the Local Rules of this Court, Capewell respectfully requests oral argument at a date and time to be set by this Court. Capewell does not request an evidentiary hearing.

/s/ Gordon P. Cleary

Gordon P. Cleary, No. 1948
Brooks R. Magratten, No. 3585
VETTER & WHITE
Attorneys for Defendant Capewell
Components Co., LLC
20 Washington Place
Providence, Rhode Island 02903
(401) 421-3060
(401) 272-6803 FAX
gcleary@vetterandwhite.com
bmagratten@vetterandwhite.com

Charles L. Howard, Esq.
SHIPMAN & GOODWIN LLP
One Constitution Plaza
Hartford, Connecticut 06103
(860) 251-5000
(860) 251-5319 FAX
choward@goodwin.com

Dated: May 12, 2008

CERTIFICATE OF SERVICE

To:

Peter J. Brockmann, Esq.
Brockmann & Associates, Ltd.
77 Narragansett Avenue
Jamestown, RI 02835

I hereby certify that I electronically filed this Motion on May 12, 2008. The Motion is available for viewing and downloading from the Court's Electronic Case Filing system. Service on the above-identified counsel of record will be effectuated by electronic means and by mailing first class mail, postage prepaid, to non-registered parties.

/s/ Gordon P. Cleary

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| COLLABORATION TECHNOLOGIES, INC., Plaintiff | ) | C.A. No. 08-165 |
| vs. | ) | |
| CAPEWELL COMPONENTS CO., LLC, Defendant | ) | |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF COMBINED MOTION TO COMPEL ARBITRATION AND STAY LITIGATION**

The defendant, Capewell Components Co., LLC ("Capewell"), respectfully submits this memorandum of law in support of its Combined Motion to Compel Arbitration and Stay Litigation. The plaintiff, Collaboration Technologies, Inc. ("CTI"), expressly agreed to submit to arbitration any controversy or claim arising from the operation of the February 6, 2006 Sales and Marketing Representative Agreement (the "Agreement," a true copy of which is attached hereto as Exhibit A) with the defendant Capewell. All of CTI's claims against Capewell in this action are subject to this arbitration provision. Capewell therefore moves to compel arbitration and to stay this litigation until the conclusion of such arbitration.

## I. FACTUAL BACKGROUND

### A. The Parties

Capewell is a leading manufacturer of life support and aerial delivery products, supplying its products and services worldwide to, among others, military customers. See Complaint, ¶ 3. CTI alleges that it was "formed primarily to develop technical software used to support war fighters by way of sophisticated collaboration technology." Id., ¶ 5. Plaintiff further asserts that "[f]ollowing years of research and development, mostly if not entirely undertaken by the principal of CTI, Joshua Trainer, CTI's flagship software product (hereafter, 'the Software') became ready for marketing and sales." Id., ¶ 6.

**B. The Agreement**

On February 6, 2006, the parties entered into a Sales and Marketing Representative Agreement (the "Agreement").[1] Id., ¶ 9 & Ex. A. As alleged by the plaintiff, pursuant to the Agreement, Capewell "was appointed as CTI's sales and marketing representative for the Software with exclusive international rights and limited U.S. rights …." Id., ¶ 10(a); Agreement, ¶ 1. The plaintiff further alleges that, pursuant to the Agreement, Capewell was responsible for "coordinating and submitting the application for any necessary licenses for the export of technical data and classified defense articles." Complaint, ¶ 11.

The Agreement expressly contemplates that in its role as "sales and marketing representative," Capewell would enter into contracts with and receive purchase orders from customers for sales of licenses of the Software. See Agreement, ¶ 6. Specifically, paragraph 6 of the Agreement provides:

> 6. CONTRACTUAL COMMITMENTS
>
> Upon receipt by CAPEWELL of a binding commitment from a customer in the form of a contract, purchase order, letter of commitment, or other legally binding document concerning the procurement of [the Software], CAPEWELL will promptly provide a copy of such commitment to CTI.

The Agreement further expressly contemplates that in its role as "sales and marketing representative" Capewell would purchase from CTI the Software licenses needed to fulfill purchase orders or other contractual commitments with customers. See Agreement, ¶ 12. Specifically, paragraph 12 of the Agreement provides in relevant part:

[1] Paragraph 9 of plaintiff's Complaint states that the Agreement is attached to plaintiff's Complaint as Exhibit A. It does not appear from the electronic docket, however, that plaintiff filed its Exhibit A with the Court. Accordingly, as a matter of convenience, Capewell has attached hereto a true, accurate and complete copy of the Sales and Marketing Representative Agreement dated February 6, 2006 referred to in paragraph 9 of plaintiff's Complaint.

> 12. PAYMENTS
>
> All payments to CTI for Products and services will be due and payable by CAPEWELL not later than 15 days after receipt of payment by CAPEWELL or sixty days after invoice (for US orders) or 150 days (for international), whichever is shorter.

In paragraph 19 of the Agreement, Capewell and CTI expressly and unequivocally chose binding arbitration as the method for resolving any controversy or claim between them arising from the operation of the Agreement. See Agreement ¶ 19 ("Arbitration Clause"). The Arbitration Clause states that:

> Any controversy or claim arising from the operation of this Agreement shall be settled through arbitration conducted in the State of Rhode Island, under the rules of the American Arbitration Association (AAA). CTI and CAPEWELL agree to share equally the cost of services of the AAA. The parties agree to be bound by the decision of the AAA arbitrator.

Agreement ¶ 19.

Plaintiff alleges that on December 19, 2007, the Australian Ministry of Defence issued a purchase order for 30 Software licenses and, thereafter, Capewell issued a corresponding purchase order to CTI. Complaint, ¶¶ 19, 23, 25. By letter dated April 14, 2008, Capewell noted ongoing and unaddressed concerns it had regarding CTI's ability to support the Software and terminated the Agreement, for cause, pursuant paragraph 2 of the Agreement. Id., ¶ 30 and Ex. G; Agreement, ¶ 2. In that letter, Capewell also informed CTI that it intended to inform the Australian Ministry of Defence of the termination of Capewell's relationship with CTI and would "encourage them to deal directly with CTI." Complaint, Ex. G. Capewell further articulated its expectation that the purchase order placed by the Australian Ministry of Defence with Capewell and the purchase order placed by Capewell with CTI would be terminated and a new purchase order placed directly with CTI by the Australian Ministry of Defence would be substituted. Id. Plaintiff further alleges that "the defendant advised CTI that the arms traffic export license required for execution of the deliverable for [the Australian Ministry of Defence]

had yet to be issued by the U.S. Department of State. In fact, unbeknownst to CTI, the U.S. State Department notified the defendant on or about March 24, 2008, that its application was voided and returned without action." Id., ¶ 36.

### C. CTI Breaches the Arbitration Clause

On May 2, 2008, in breach of its agreement to arbitrate any controversy or claim arising from the operation of the Agreement, the plaintiff instituted this action. The Complaint purports to assert claims against Capewell for breach of the Agreement (Count One), breach of the purchase order from Capewell to CTI (Count Two), breach of the purchase order from the Australian Ministry of Defence to Capewell (Count Three), tortious interference with CTI's contractual relationship with the Australian Ministry of Defence (Count Four) and breach of the implied covenant of good faith and fair dealing (Count Five).[2] Capewell now moves this Court to compel CTI to arbitrate its claims against Capewell. Capewell further moves for an order staying this action until such arbitration is concluded.

## II. LAW AND ARGUMENT

### A. Federal Law Strongly Favors Arbitration.

Federal law reflects a "liberal policy favoring arbitration agreements." Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983); see also Bercovitch v. Baldwin Sch., 133 F.3d 141, 147 (1st Cir. 1998)(same); Baychar, Inc. v. Frisby Techs., No. 01-CV028-B-S, 2001 U.S. Dist. LEXIS 11037, at *15 (D. Me. July 26, 2001). The Federal Arbitration Act ("FAA" or the "Act"), 9 U.S.C. §§ 1-16, authorizes judicial enforcement of arbitration agreements between private parties regarding disputes that affect interstate commerce. Section 2 of the Act provides in relevant part that a "written provision in ... a contract evidencing

[2] Plaintiff also moved for a temporary restraining order and/or preliminary injunction (Doc. No. 5). A hearing was held by this Court on May 7, 2008, at which time this Court denied the plaintiff's motion.

a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

When the claims asserted in a federal action are subject to an arbitration agreement, Section 3 of the Act directs courts, upon motion by a party, to stay the pending litigation, and Section 4 directs courts to compel arbitration. 9 U.S.C. §§ 3, 4; see also Large v. Conseco Finance Servicing Corp., 292 F.3d 49, 52 (1st Cir. 2002) (FAA "requires a federal court in which suit has been brought upon any issue referable to arbitration under an agreement in writing for such arbitration to stay the court action pending arbitration once it is satisfied that the issue is arbitrable under the agreement" (internal quotation marks omitted)). "By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985) (emphasis in original).

A court considering a motion to compel arbitration must undertake two fundamental tasks. First, it must determine whether the parties agreed to arbitrate their disputes. Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Corp., 473 U.S. 614, 626 (1985). "When determining whether the parties agreed to arbitrate, federal courts utilize general state law principles of contract law. In doing so, courts look to state common law principles applicable to contracts in general, but not state laws that single out arbitration contracts." Baychar, Inc. v. Frisby Techs., No. 01-CV028-B-S, 2001 U.S. Dist. LEXIS 11037, at *15 (D. Me. July 26, 2001) (citations omitted) (compelling arbitration and staying proceedings). "In analyzing contractual language pursuant to general common law principles, the Court first looks to the plain language

of the agreement." Baychar, Inc., 2001 U.S. Dist. LEXIS, at *17. Pursuant to Rhode Island law, which governs the interpretation of the Agreement:[3]

> The rules of contract interpretation ... are well settled. Our primary task, of course is to attempt to ascertain the intent of the parties. In interpreting a written contract, the intention of the parties must govern if that intention can be clearly inferred from its terms and can be fairly carried out consistent with settled rules of law. It must be added, however, that the intent we seek is not some undisclosed intent that may have existed in the minds of the contracting parties but the intent that is expressed by the language contained in the contract. And, in interpreting the language of the contract, the words used are to be assigned their ordinary meaning. Furthermore, in ascertaining the intent, we must look at the instrument as a whole and not at some detached portion thereof.

Woonsocket Teachers' Guild v. School Committee of the City of Woonsocket, 367 A.2d 203, 205 (R.I. 1976) (citations omitted). This inquiry must be undertaken in the light of and be "informed by FAA jurisprudence." Brennan v. King, 139 F.3d 258, 264 (1st Cir. 1998).

Second, if the Court finds an agreement to arbitrate between the parties, it must then examine the issues in dispute to determine whether they fall within the scope of the agreement to arbitrate. See Bercovitch, 133 F.3d at 148 (after finding valid arbitration agreement, a court asked to compel arbitration must determine whether the agreement covers the dispute in question).[4] "Once the Court finds that the parties have agreed to arbitrate a claim, it is at this point in the analysis that the federal presumption of arbitrability comes into play. This presumption dictates that as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration...." Baychar, Inc., 2001 U.S. Dist. LEXIS, at *17 (citations omitted)(internal quotation marks omitted); see also Moses H. Cone Mem'l Hosp., 460 U.S. at 24-25; Brennan, 139 F.3d at 264. A court may not deny a party's request to compel arbitration "unless it may be said with positive assurance that the arbitration

---

[3] See Agreement, ¶ 20(a).

[4] A third factor, whether the party seeking an arbitral forum has waived its right to arbitration is not at issue here. See Combined Energies v. CCI, Inc., 514 F.3d 168, 171 (1st Cir. 2008) (motion to compel arbitration decided under three-factor test); see also Lifetime Med. Nursing Servs., Inc. v. Cambridge Automation Corp., 780 F. Supp. 882, 883 (D.R.I. 1991) (articulating standard for waiver).

clause is not susceptible of an interpretation that covers the asserted dispute." United Steel Workers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960). Notably, a party may not avoid arbitration "by dint of artful pleading alone." Combined Energies v. CCI, Inc., 514 F.3d 168, 172 (1st Cir. 2008); see also Kiefer Specialty Flooring, Inc. v. Tarkett, Inc., 174 F.3d 907, 910 (7th Cir. 1999) ("[W]e need not view these claims [arising in tort and contract] in isolation when the claims arise from the very same act. We have routinely held that a party may not avoid a contractual arbitration clause merely by casting its complaint in tort" (internal quotation marks omitted)).

As discussed below, CTI unequivocally agreed to submit any controversy or claim arising from the operation of the Agreement with Capewell to binding arbitration. The broad scope of the Arbitration Clause encompasses all the claims CTI has asserted against Capewell in this action.

### B. The Agreement Contains A Valid Agreement To Arbitrate.

The Agreement indisputably contains an arbitration clause that is subject to the FAA. On its face, the Agreement between a Rhode Island corporation and a Connecticut limited liability company is an agreement that affects interstate commerce. Just as plainly, the Agreement contains a valid agreement to arbitrate. In paragraph 19 of the Agreement, CTI and Capewell agreed to arbitrate "any controversy or claim arising from the operation of th[e] Agreement . . . ." Agreement, ¶ 19. This arbitration agreement is valid, irrevocable, and enforceable under the FAA.

### C. The Broad Scope of the Arbitration Clause Encompasses All The Claims That CTI Has Asserted Against Capewell In This Action.

The arbitration clause in the Agreement is broad and encompasses more than just an alleged breach of the Agreement—it specifically states that arbitration is required for "any controversy or claim arising from the *operation* of the Agreement." (Emphasis added.) Each of

the five counts asserted against Capewell in CTI's Complaint arises from the operation of the Agreement. Accordingly, to effect the federal policy favoring arbitration, this Court should compel CTI to submit its claims against Capewell to arbitration.

**1. CTI's Breach of Contract Claims Asserted in Counts One, Two, Three and Five Arise From the Operation of the Agreement.**

CTI's breach of contract claims each arises from the operation of the Agreement. Accordingly, Counts One, Two, Three and Five fall within the scope of the Arbitration Clause and Capewell's motion to compel arbitration and stay this action should be granted.

Plaintiff cursorily asserts that Capewell has breached the Agreement (Count One), the purchase order placed by Capewell with CTI (Count Two), the purchase order placed by the Australian Ministry of Defence with Capewell (Count Three), and the covenant of good faith and fair dealing (Count Five). Each of these causes of action arises out of and rely on the same set of factual allegations, and all derive from the Agreement. Complaint, ¶¶ 38, 41, 44 and 51 ("The plaintiff hereby incorporates above paragraphs numbered 1 through 37 inclusive as if fully set forth and realleged herein."). Although CTI does not specify what particular provisions of the Agreement Capewell is alleged to have breached, see Complaint, ¶ 39 ("The actions and/or omissions of the defendant as set forth hereinabove are in breach of the Agreement and constitute a breach of contract."), there can be no question that CTI's claim in Count One that Capewell breached the Agreement arises from the operation of the Agreement and thus is subject to and falls within the scope of the Arbitration Clause.

With regard to Counts Two and Three, alleging Capewell's breach of the purchase orders between it and CTI and between it and the Australian Ministry of Defence, it is similarly unclear what provisions of the purchase orders Capewell is alleged to have breached. See Complaint, ¶¶ 42 and 46 ("The actions and/or omissions of the defendant as set forth hereinabove are in breach of the CTI P.O. [A-DOD P.O.] and constitute a breach of contract.").

Plaintiff's artful (or in this case, inartful) pleading alone, however, will not subvert its contractual obligation to arbitrate any claim or controversy arising from the operation of the Agreement. Combined Energies, 514 F.3d at 172. In any event, the claims asserted in Counts Two and Three clearly arise from the operation of the Agreement. Indeed, the purchase orders not only are expressly contemplated by the Agreement, see Agreement, ¶¶ 6 and 12, but they are also the evidence and result of Capewell's attempt to perform its obligations under the Agreement despite its growing concerns regarding CTI's ability to perform. The purchase orders themselves arise from the operation of the Agreement, and, accordingly, any claim by CTI that Capewell has breached those purchase orders is a claim that arises from the operation of the Agreement.

Plaintiff's Count Five, which purports to allege breach of the covenant of good faith and fair dealing, is similarly vague, not even specifying whether plaintiff refers to the Agreement or one or both of the purchase orders. Complaint, ¶ 52 ("The defendant's actions and/or omissions as set forth hereinabove are in breach of the implied covenant of good faith and fair dealing."). Regardless of whether this claim relates to the Agreement or the purchase orders, it is a claim that arises from the operation of the Agreement. As noted above, any claim that Capewell breached the Agreement, including the implied covenant of good faith and fair dealing that is inherent in that Agreement under Rhode Island law, clearly arises from the operation of the Agreement. Likewise, because the purchase orders themselves arise from the operation of the Agreement, any claim by plaintiff that Capewell breached the purchase orders, including any implied covenants of good faith and fair dealing, is a claim arising from the operation of the Agreement.

As noted above, the factual allegations that serve as the foundation to plaintiff's claim that Capewell breached the Agreement (Count One) are the same facts that support

plaintiff's claims that Capewell breached the purchase orders (Counts Two and Three) and the covenant of good faith and fair dealing (Count Five). See Complaint, ¶¶ 38, 41, 44 and 51. It is apparent, therefore, that each of these claims is related to plaintiff's claim that Capewell breached the Agreement, and this Court should conclude that all of CTI's claims should proceed to arbitration pursuant to the arbitration clause contained in the Agreement. Baychar, Inc., 2001 U.S. Dist. LEXIS 11037, at *18-*19. Finally, to the extent that there is any doubt, the strong federal policy favoring arbitration mandates that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone Memorial Hosp., 460 U.S. at 24-25.

Accordingly, this Court should grant Capewell's motion, compel CTI to honor its contractual obligation to arbitrate the claims alleged in Counts One, Two, Three and Five and stay this action pending arbitration in accordance with the parties' Agreement.

**2. The Tortious Interference Claim Alleged in Count Four Arises From the Operation of the Agreement and Is Therefore Arbitrable.**

CTI's tortious interference claim similarly arises from the operation of the Agreement and, accordingly, falls within the scope of the Arbitration Clause. Capewell's motion to compel arbitration and stay this action should therefore be granted.

As with its breach of contract claims, plaintiff's tortious interference claim is pleaded in only the most cursory fashion. See Complaint, ¶ 49 ("By its actions and/or omissions as set forth hereinabove, the defendant has intentionally interfered with the contraction relations between CTI and A-DOD."). Count Four also is based on and arises out of the same set of factual allegations as plaintiff's contract claims. Complaint, ¶ 48 ("The plaintiff hereby

incorporates above paragraphs numbered 1 through 37 inclusive as if fully set forth and realleged herein.").[5]

While it is unclear here what "contractual relationship" CTI claims to have with the Australian Ministry of Defence, any such alleged relationship (assuming for purposes of this motion only that such a relationship could exist) could only have arisen from Capewell's attempts to perform under the Agreement as the sales and marketing representative for CTI. Any such alleged relationship thus arises from the operation of the Agreement, and, accordingly, plaintiff's claim that Capewell tortiously interfered with that relationship arises from the operation of the Agreement. Since the factual allegations that serve as the foundation to plaintiff's breach of contract claims are the same facts that support plaintiff's tortious interference claim, see Complaint, ¶ 48, it is clear that these claims are all related to one another. The Court, therefore, should conclude that all of CTI's claims should proceed to arbitration pursuant to the arbitration clause contained in the Agreement. Baychar, Inc., 2001 U.S. Dist. LEXIS 11037, at *18-*19. The strong federal policy favoring arbitration mandates that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone Memorial Hosp., 460 U.S. at 24-25.

## III. CONCLUSION

The Arbitration Clause in the Agreement between CTI and Capewell requires CTI to arbitrate any controversy or claim arising from the operation of the Agreement. All of CTI's claims against Capewell in this action fall within the scope of this agreement to arbitrate.

---

[5] A claim for tortious interference is arbitrable. See, e.g., Kiefer Specialty Flooring, Inc. v. Tarkett, Inc., 174 F.3d 907, 909-11 (7th Cir. 1999) (concluding that tortious interference claim within scope of arbitration provision where "a significant relationship exists between Keifer's claim of tortious interference and the arbitration provision"); (VDV Media Corp. v. Relm Wireless, Inc., No. 3:05-cv-1877-H, 2006 U.S. Dist. LEXIS 7315, at *5-*6 (N.D. Tex. Feb. 27, 2006) (noting rule that "[w]hen determining whether a tort claim falls within the scope of an arbitration clause, the district court must focus on the factual allegations in the complaint, not on the nominal characterization of the legal cause of action" and finding that narrow arbitration clause encompassed tortious interference claim).

Pursuant to the Federal Arbitration Act, the Court should therefore enforce the parties' agreement to arbitrate by staying this action and compelling CTI to arbitrate all of its claims against Capewell.

/s/ Gordon P. Cleary
Gordon P. Cleary, No. 1948
Brooks R. Magratten, No. 3585
VETTER & WHITE
Attorneys for Defendant Capewell Components Co., LLC
20 Washington Place
Providence, Rhode Island 02903
(401) 421-3060
(401) 272-6803 FAX
gcleary@vetterandwhite.com
bmagratten@vetterandwhite.com

Charles L. Howard, Esq.
SHIPMAN & GOODWIN LLP
One Constitution Plaza
Hartford, Connecticut 06103
(860) 251-5000
(860) 251-5319 FAX
choward@goodwin.com

Dated: May 12, 2008

CERTIFICATE OF SERVICE

To:

Peter J. Brockmann, Esq.
Brockmann & Associates, Ltd.
77 Narragansett Avenue
Jamestown, RI 02835

I hereby certify that I electronically filed this Memorandum on May 12, 2008. The Memorandum is available for viewing and downloading from the Court's Electronic Case Filing system. Service on the above-identified counsel of record will be effectuated by electronic means and by mailing first class mail, postage prepaid, to non-registered parties.

/s/ Gordon P. Cleary